UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

C.M., individually and on behalf of H.S.,

                     Plaintiffs,

        - against -

THE NEW YORK CITY DEPARTMENT OF
EDUCATION, and CARMEN FARIÑA, in
her official capacity as Chancellor of the New
York City Department of Education,

                     Defendants.

**OPINION AND ORDER**

15 Civ. 6275 (ER)

Ramos, D.J.:

       C.M., ("Plaintiff") individually and on behalf of her child, H.S., filed suit against the

New York City Department of Education (the "DOE" or "District") and Carmen Fariña, in her

official capacity as the Chancellor of the DOE (together "Defendants"), under the Individuals

with Disabilities Education Act ("IDEA"), Section 504 of the Rehabilitation Act of 1973, and

Article 89 of New York State Education Law, seeking funding for H.S.'s tuition at the Rebecca

School for the 2011-2012 school year.  Before the Court are the parties' cross-motions for

summary judgment.

       For the reasons set forth below, Plaintiff's motion for summary judgment is DENIED and

Defendants' motion for summary judgment is GRANTED.

# I.  STATUTORY FRAMEWORK

## A.  The IDEA

       Congress enacted the IDEA to encourage the education of children with disabilities.

*E.A.M. ex rel. E.M. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1

(S.D.N.Y. Sept. 29, 2012) (citing *Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)).  The statute

mandates that any state receiving federal funds must provide a free appropriate public education ("FAPE") to children with disabilities. *See* 20 U.S.C. § 1412(a)(1)(A); *Rowley*, 458 U.S. at 181. The FAPE provided by the state must include "special education and related services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(9), and must be "reasonably calculated to enable the child to receive educational benefits," *Rowley*, 458 U.S. at 207.

A public school ensures that a student with disabilities receives a FAPE by providing the student with an Individualized Education Plan ("IEP"). *See Polera v. Bd. of Educ.*, 288 F.3d 478, 482 (2d Cir. 2002). An IEP is a written statement, collaboratively developed by the parents of the child, educators, and specialists, that "sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives." *M.O. v. N.Y.C. Dep't of Educ.*, 793 F.3d 236, 239 (2d Cir. 2015) (quoting *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012)).

Because New York State receives federal funds under the IDEA, it must comply with the requirements of the statute. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 123 (2d Cir. 1998). In New York, the task of developing an IEP rests with local Committees on Special Education ("CSEs"), whose members are appointed by the board of education or trustees of the school district. *Id.* (citing N.Y. Educ. Law § 4402(1)(b)(1); *Heldman ex rel. T.H. v. Sobol*, 962 F.2d 148, 152 (2d Cir. 1992)). "CSEs are comprised of members appointed by the local school district's board of education, and must include the student's parent(s), a regular or special education teacher, a school board representative, a parent representative, and others." *R.E.*, 694 F.3d at 175 (citing N.Y. Educ. Law § 4402(1)(b)(1)(a)). "In developing a child's IEP, the CSE is required to consider four factors: '(1) academic achievement and learning characteristics,

2

(2) social development, (3) physical development, and (4) managerial or behavioral needs.'"
*E.A.M. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 3730 (LAP), 2012 WL 4571794, at *1 (quoting
*Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107–08 (2d Cir. 2007)).

        To provide a FAPE, an IEP must be "reasonably calculated to enable the child to receive
educational benefits," "likely to produce progress, not regression," and afford the student with an
opportunity to achieve greater than mere "trivial advancement."  *Cerra v. Pawling Cent. Sch.
Dist.*, 427 F.3d 186, 192, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 129–30).  "A school
district is not, however, required to furnish 'every special service necessary to maximize each
handicapped child's potential,'" *id.* at 195 (quoting *Rowley*, 458 U.S. at 207), or "everything that
might be thought desirable by loving parents," *Walczak*, 142 F.3d at 132 (quoting *Tucker v. Bay
Shore Union Free Sch. Dist.*, 873 F.2d 563, 567).  Rather, the IDEA calls only for selection of a
program that provides a "basic floor of opportunity."  *Walczak*, 142 F.3d at 132 (quoting *Rowley*,
458 U.S. at 201); *see id.* at 130 ("IDEA does not itself articulate any specific level of educational
benefits that must be provided through an IEP.").  "[B]ecause public 'resources are not infinite,'
federal law 'does not secure the best education money can buy; it calls upon government, more
modestly, to provide an appropriate education for each [disabled] child.'"  *Id.* (quoting *Lunceford
v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984)); *see also C.F. ex rel. R.F. v. N.Y.C.
Dep't of Educ.*, 746 F.3d 68, 72 (2d Cir. 2014).  Furthermore, under an IEP, "education [must] be
provided in the least restrictive setting consistent with a child's needs" and the CSE must "be
mindful of the IDEA's strong preference for mainstreaming, or educating children with
disabilities [t]o the maximum extent appropriate alongside their non-disabled peers."  *M.H. v.
N.Y.C. Dep't of Educ.*, 685 F.3d 217, 224 (2d Cir. 2012) (internal quotation marks omitted).

In addition to imposing the IEP requirement, the IDEA provides for due process procedures to promptly resolve disputes that arise between parents and school districts, so that children will receive appropriate special education services.  20 U.S.C. § 1415(b)(6)–(b)(7).  New York State has implemented a two-tiered system of administrative review for disputes regarding "any matter relating to the identification, evaluation or educational placement of a student with a disability . . . or the provision of a [FAPE] to such a student."  *Id.*; 8 N.Y.C.R.R. § 200.5(i)(1).  First, "[p]arents may challenge the adequacy of their child's IEP in an 'impartial due process hearing' before an [independent hearing officer ("IHO")] appointed by the local board of education."  *E.A.M.*, 2012 WL 4571794, at *2 (quoting *Gagliardo*, 489 F.3d at 109).  Either party may then appeal the independent hearing officer's decision to the New York State Review Officer ("SRO"), an officer of New York State's Board of Education tasked with conducting an impartial review of the proceedings.  *Id.*; 34 C.F.R. § 300.514(b)(2); 8 N.Y.C.R.R. § 279.1(d).

After the SRO has rendered its decision, either party may then appeal to either state or federal district court.  N.Y. Educ. Law § 4404(3)(a).  If appealed to federal district court, the court must "receive the records of the administrative proceedings" and, if requested by the parties, hear additional evidence.  20 U.S.C. § 1415(i)(2)(C).  The district court then "grant[s] such relief as the court determines is appropriate," based on the preponderance of the evidence.  *Id.*  Under the statute, "appropriate" relief may include reimbursement for the cost of a private school placement.  *E.A.M.*, 2012 WL 4571794, at *2.

## B.  Claims for Tuition Reimbursement Under the IDEA

"'Parents who . . . believe that a FAPE is not being provided to their child may unilaterally enroll the child in a private school and seek tuition reimbursement from the school

district' by filing what is known as a 'due process complaint.'"  *M.O.*, 793 F.3d at 239 (quoting

*Hardison v. Bd. of Educ.*, 773 F.3d 372, 376 (2d Cir. 2014); *see also* N.Y. Educ. Law § 4404(1);

and 20 U.S.C. § 1412(a)(10)(C)(ii)).  Parents who unilaterally place their child in a private

school do so "at their financial risk."  *Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211,

215 (2d Cir. 2014).

 "The Supreme Court has established the three-pronged *Burlington/Carter* test to

determine eligibility for [tuition] reimbursement, which looks to (1) whether the school district's

proposed plan will provide the child with a free appropriate public education; (2) whether the

parents' private placement is appropriate to the child's needs; and (3) a consideration of the

equities."  *C.F.*, 746 F.3d at 73 (citation and internal quotation marks omitted).[1]

 With specific respect to the first *Burlington/Carter* prong, "challenges to a school

district's proposed placement school must be evaluated prospectively (*i.e.*, at 'the time of the

parents' placement decision') and cannot be based on mere speculation."  *M.O.*, 793 F.3d at 244

(quoting *R.E.*, 694 F.3d at 195).  Thus, evaluation of the IEP must be based only on information

available to the parent at the time he or she was considering the IEP and the school district's

proposed placement, and not on retrospective evidence that came to light after the parent chose

to reject the district's placement and enroll the child in private school.  *See, e.g.*, *id.*; *R.E.*, 694

F.3d at 188.

 "Under New York's Education Law § 4404(1)(c), the local school board bears the initial

burden of establishing the validity of its plan at a due process hearing.  If the board fails to carry

---

[1] The *Burlington/Carter* test is named after two Supreme Court cases:  *School Committee of the Town of Burlington v. Department of Education of the Commonwealth of Massachusetts*, 471 U.S. 359, 370, 374 (1985), and *Florence County School District Four v. Carter*, 510 U.S. 7, 15–16 (1993).

this burden, the parents bear the burden of establishing the appropriateness of their private placement and that the equities favor them." *R.E.*, 694 F.3d at 184–85 (citing *Cerra*, 427 F.3d at 192).[2]  The district court retains discretion over whether to award tuition reimbursement.  *See* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer *may* require the agency to reimburse the parents for the cost of [private] enrollment.") (emphasis added).

## C. Section 504 Claims

Section 504 of the Rehabilitation Act of 1973 provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  The "IDEA and Section 504 are complementary, but they address different injuries and thus require different proof.  Specifically, Section 504 offers relief from discrimination, whereas IDEA offers relief from inappropriate educational placement, regardless of discrimination."  *Gabel ex rel. L.G. v. Bd. of Educ.*, 368 F. Supp. 2d 313, 333 (S.D.N.Y. 2005).

 "A plaintiff may assert a Section 504 claim in conjunction with an IDEA claim on the theory that he has been denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive."  *D.C. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 950 F. Supp. 2d 494, 517–18 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).  "To recover under the Rehabilitation Act, there must be evidence that:  (1) the student is disabled; (2) the student is otherwise qualified to participate in school activities; (3) the school or the board receives federal financial assistance; and (4) the student was excluded from

---

[2] "[T]o the extent that a court 'must determine whether the state administrative decisions were supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise.'"  *Reyes*, 760 F.3d at 215 (quoting *M.H.*, 685 F.3d at 225 n.3).

participation in programs at, denied the benefits of, or subject to discrimination at, the school on the basis of her disability." *Id.* at 518 (quoting *Schreiber v. E. Ramapo Cent. Sch. Dist.*, 700 F. Supp. 2d 529, 564 (S.D.N.Y. 2010)).

"Since Section 504 relief is conditioned on a showing of discrimination, it requires something more than proof of a mere violation of IDEA—*i.e.*, more than a faulty IEP." *Gabel*, 368 F. Supp. 2d at 334 (citing *J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 70 (2d Cir. 2000)). Rather, a plaintiff must prove some additional level of "intentional discrimination," which "may be inferred when a school district acts with gross negligence or reckless indifference in depriving a child of access to a FAPE." *Id.*

## II.  REVIEW OF ADMINISTRATIVE RECORD

### A.  Background Facts

H.S. is an eighteen-year-old student diagnosed with Pervasive Developmental Disorder, an autism spectrum disorder.  Ex. 4.[3]  In 2000, after his diagnosis, H.S. attended a 6:1:1 (six students, one teacher, and one paraprofessional) special class program at P373, a public school within the district.  Tr. 1023-24.  Plaintiff believed that H.S. was not progressing at P373 and after only one year, enrolled H.S. at the Brooklyn Blue Feather School (a New York State approved non-public school), where he remained until 2009.  In May 2009, the District convened a CSE meeting to create H.S.'s IEP for the 2009-2010 school year.[4]  Ex. L.  At this meeting, Plaintiff and H.S.'s then-teacher expressed their concerns that H.S.'s placement was not

---

[3] Citations to "Ex." refer to the parties' exhibits from the underlying impartial hearing in this case, citations to "Tr." refer to pages of the transcript of the underlying impartial hearing in this case, and citations to "IHO Ex." refer to exhibits entered into the record by the IHO in the underlying impartial hearing in this case.

[4] H.S.'s 2009 IEP recommended that he receive 8:1:4 instruction at the Brooklyn Blue Feather School.  Ex. L.  It also notes that a "special class in a specialized school was considered and rejected as [H.S.'s] significant global/developmental delays require a small structure environment with intensive supervision."  *Id.*

providing sufficient support for him.  Tr. 1030-31.  Though Plaintiff informed the District about her concerns, the CSE received no response from the District.  As a result, Plaintiff unilaterally enrolled H.S. at the Rebecca School, a private school.   Tr. 1037.  By the 2011-2012 school year, H.S. was thirteen and was starting his third year at the Rebecca School.[5]

At the Rebecca School, H.S. was in a class with five students, one teacher, and two teacher assistants.  H.S. also had a 1:1 paraprofessional and regularly received speech and language therapy, occupational therapy ("OT"), and physical therapy ("PT").  Tr. 908-09.

**B.  CSE Meeting**

On January 26, 2011, the District convened a CSE meeting to develop an IEP for H.S. for the 2011-2012 school year.  Ex. 4.  The CSE was comprised of Plaintiff; Rose Fochetta ("Dr. Fochetta"), a district school psychologist; Feng Ye, a district representative/special education teacher; Avis Alexander, a district social worker; Sandra Morabito, a parent member; Gwen Levine, a Rebecca School social worker; and Sara Gerstein, H.S.'s teacher at the Rebecca School.  Ex. 4.  Gerstein participated via telephone.  Of the five professionals that comprised the CSE, only three – Dr. Fochetta, Alexander, and Gerstein – had met H.S. prior to the CSE meeting.

The materials available to the CSE at the time of the meeting included:  (1) H.S.'s IEP for the previous year (2010-2011); (2) a 2009 Psycho-Educational ("P-E") evaluation; (3) a 2009 social history update; (4) an October 2010 classroom observation report; and (5) a December 2010 Rebecca School Interdisciplinary Report of Progress ("Rebecca Progress Report"):

> ***H.S.'s 2010 IEP.***  The CSE meeting for H.S.'s 2010 IEP was held on April 8, 2010.
> The CSE recommended that H.S. receive instruction in a 6:1:1 special class in a

---

[5] Notably, Plaintiff testified that H.S.'s tuition at the Rebecca School had been fully funded by the District for the 2009-2010 and 2010-2011 school years.  Tr. 1036, 1079.  However, she provides no further details regarding the basis for the District's funding of H.S.'s tuition.

specialized school and related services.  The related services included a 1:1 crisis management paraprofessional, speech and language therapy, PT, and OT.  Notably, it also stated that a "Non Public School [NPS] program was considered and rejected."  The CSE found that H.S. "had previously been in an NPS school for 5 years and failed to make significant academic progress" and maintained that H.S.'s needs "can best be met within a highly structured specialized public school program, given intensive, daily [OT], speech and language therapy and with a 1:1 paraprofessional."  Ex. AA.

***P-E Evaluation.***  The September 14, 2009 P-E evaluation provides a summary of H.S.'s background, cognitive functioning, and academic performance.  The evaluation states that H.S. was performing "within the Severely Delayed range of intellectual functioning" and was unable to participate in formal testing.  The examiner included information provided by Plaintiff, including that H.S. could follow certain one-step directions and identify some colors.  The report suggested that H.S. continue speech and language therapy and OT.  Ex. 11.

***Social History Update.***  The social history update was created at Plaintiff's request.  It provides a summary of H.S.'s educational status, family composition, medical status, and current functioning.  Specifically, the report states that H.S. is primarily non-verbal, needs constant supervision, and can do certain activities of daily living ("ADLs") with prompting.  Ex. 12.

***Classroom Observation.***  The classroom observation was conducted by Alexander on October 1, 2010 at the Rebecca School.  Alexander observed that H.S. barely responded to Gerstein's requests and engaged only after several direct prompts by her.  The observation report noted that H.S.'s paraprofessional was not present and because of this H.S. "was more withdrawn" than usual.  Ex. 13.

***Rebecca School Progress Report.***  The twelve-page December 2010 Rebecca Progress Report provides a comprehensive overview of H.S.'s education/functional and emotional developmental levels, the curriculum at the Rebecca School and the OT, PT, and speech and language therapy H.S. received.  Notably, the report provides that although H.S. may get distracted by noise or peers in a dysregulated state, with "maximum 1:1 adult support in a soothing environment," H.S. "is able to engage in a prolonged continuous flow for up to 30 minutes with familiar, motivating adults."  A large focus of his OT sessions was to help H.S. with regulation, body awareness, and coordination.  The major focus during PT was to help H.S. build "overall muscle strength and increase endurance," and "expand his repertoire of gross motor activities."  The last three pages list numerous long and short-term goals for H.S, including academic, OT, PT, and speech and language goals.  Ex. 15.

Dr. Fochetta testified that she reviewed all of the available materials in preparation for the

meeting and that a copy of the evaluations and reports were available at the meeting.  Tr. 499-

500.  However, the 2009 pyscho-educational evaluation and social history update were not

discussed at the meeting.   The CSE relied primarily on the 2010 IEP, the Rebecca Progress

Report, and input from Plaintiff and Gerstein to develop the IEP.  Tr. 501, 510-11, 519, 571; Ex.

4.3, 15.

### C.  2011 IEP

The January 26, 2011 IEP classifies H.S. as a student with autism.  Ex. 4.1, 4.15.  With

regard to H.S.'s academic performance and learning characteristics, the IEP provides that H.S.

"performed within the severely delayed range of cognitive functioning and . . . presents with

significant receptive and expressive language delays.  He demonstrates self-stimulatory

behaviors such as flicking his fingers and jumping up and down while making loud

vocalization."  *Id.*  The IEP noted that H.S. was nonverbal and communicated using a Pictures

Exchange Communications System ("PECS") and gestures and that he was working on "his pre-

academic[] skills."  H.S. was also "sensory seeking" and enjoyed deep pressure.  *Id.*  With regard

to his social/emotional performance, the IEP provides that H.S.'s social functioning was

"constrained by his communication limitations."  *Id.*  He also presented as either "up-regulated,"

described as needing constant movement activities, or "under-regulated," described as acting

lethargic and needing "adult support to become involved in an activity."  *Id.*  The IEP also notes

that H.S. exhibits behavior that "seriously interferes with instruction and requires additional adult

support" and lists his management needs as requiring the support of a 1:1 crisis management

paraprofessional; and benefiting from sensory supports and movement breaks throughout the

school day.  *Id.*

With regard to H.S.'s health and physical development, the IEP notes that he "presents

with a mixed sensory profile."  Ex. 4.5.  H.S. is "under-responsive to vestibular and

proprioceptive stimulation, requiring intense input in order to respond."  *Id.*  He is also "hyper-

responsive to auditory input" and frequently "places his hands over his ears to block out loud noises." *Id.* The IEP also states that H.S. "demonstrates postural insecurity" and that he resisted surfaces that do not offer a stable base of support. *Id.* To address his physical and health needs, the IEP notes that H.S. benefitted from the use of PECS, needed the support of OT and PT; and possibly needed assistance "in cleaning himself after toileting." *Id.*

The IEP also includes annual goals and short-term objectives to be achieved by the end of the 2011-2012 school year. Ex. 4-6.1 to 4-6.7. It specifies twelve annual goals in reading, math, OT, PT, speech and language therapy, and ADL. These goals were further broken down into more than thirty-five short-term objectives. *Id.* The annual goals were primarily taken from H.S.'s previous IEP. According to Dr. Fochetta, the CSE modified H.S.'s academic and ADL goals using input from Gerstein and Plaintiff, respectively. H.S.'s OT goals, taken from the Rebecca Progress Report, were also updated at the CSE.[6] Though the IEP did not include specific goals regarding H.S.'s social-emotional functioning, it did provide goals related to helping H.S. maintain a "regulated state." Tr. 543-48.

To meet H.S.'s needs as described in the IEP, the CSE recommended that he be placed in a 12 month, 6:1:1 special class in a specialized school, with a full-time 1:1 crisis management paraprofessional. Ex. 4-1. In addition, the IEP provided that H.S. should continue to receive speech and language therapy (five thirty-minute sessions per week in a separate location), PT (three thirty-minute sessions per week in a separate location), and OT (five thirty-minute sessions per week in a separate location). Ex. 4-7 to 4-8. The CSE noted that due to H.S.'s significant delays in communication and socialization, he required "greater support than can be

---

[6] The goals in the Rebecca Progress Report were developed for the 2010-2011 year by H.S.'s then-current occupational therapist.

provided in a general education setting." *Id.*  The IEP also provided that H.S. would participate in alternative assessments due to his significant cognitive and academic deficits and that he would be further assessed through "teacher observation and teacher-made materials." *Id.*

The IEP indicates that the CSE considered and rejected educational services for fewer than twelve months, specialized classes of student to teacher rations of 12:1:1 and 8:1:1, and a specialized class with a ratio of 6:1:1 without the 1:1 support of a crisis management paraprofessional.  Ex. 4-8.  It noted that these programs were not appropriate for H.S. because they were "insufficiently supportive."  H.S. needed smaller ratios in order to "receive sufficient sensory support to be engaged for academic tasks."[7]  *Id.*

On the last page, the IEP includes H.S.'s Behavior Intervention Plan ("BIP").  Ex. 4-016. The BIP lists H.S.'s interfering behaviors as "self-stimulatory behaviors manifested by flicking his fingers in front of his eyes," and difficulty communicating his needs to others.  It further provides that H.S. "needs frequent sensory and movement breaks throughout the day," and that if he is "denied his wants, he may go limp, drop to the floor and refuse to engage with others." H.S. is also described as "very distracted by food being around him, and will focus on the food rather than the task at hand." *Id.*  Additionally, the BIP sets behavioral goals and provides strategies to help address H.S.'s behaviors.  These strategies include providing "deep pressure, vestibular and proprioceptive input as well as movement breaks throughout the school day" and a 1:1 support in order to "increase his engagement and availability for academics," "sustain engagement with an adult," and "reduce self-stimulatory behaviors." *Id.*  The BIP does not specifically identify the particular sensory equipment that would be used or how the movement

---

[7] This language is almost identical to the language in H.S.'s 2010 IEP.  However, the 2011 IEP did not include the consideration and rejection of a non public school program.

breaks would be implemented.  It only restates the services to which H.S. would be entitled, namely, speech and language therapy, OT, PT, and a 1:1 crisis management paraprofessional. *Id.*

Plaintiff claims that she objected to the recommendation that H.S. attend a 6:1:1 special class at the CSE meeting.  Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (Doc. 22) ("Pl. Memo") at 5.  However, she was given no opportunity to express her concerns and the CSE meeting was "abruptly" ended as soon as she began expressing her disagreement.  *Id.*

**D.  Placement Offer**

On June 14, 2011 (approximately five months after the CSE meeting), the District sent Plaintiff a Final Notice of Recommendation ("FNR") offering H.S. a placement in a 6:1:1 special class at P721R The Richard H. Hungerford School ("Hungerford"), with related services and the provision for a 1:1 crisis paraprofessional for the 2011–2012 school year.  Ex. 5.  Though Plaintiff had previously visited Hungerford, shortly after receiving the FNR she returned to the school for a visit.  Tr. 1056-57.  During this visit, Plaintiff met with Michael Pepe ("Pepe"), the Assistant Principal of Organizations at Hungerford, and a parent coordinator.  Plaintiff testified that, among other things, she received a tour of the school in which she saw a classroom, the lunchroom, and the multipurpose room.  Tr. 1058-63.  Though she did not know H.S.'s specific class placement at the time, Plaintiff found that Hungerford could not meet H.S.'s needs or adequately implement his IEP.

In a letter dated June 21, 2011, Plaintiff informed the District that she rejected the recommended placement and that she would be requesting an impartial hearing to receive funding for H.S.'s tuition at the Rebecca School.  Ex. P.  Plaintiff claimed that she found

Hungerford to be an inappropriate place for H.S. because it was "too noisy," the curriculum was "too advanced," and the cafeteria was overly stimulating during the lunch period. *Id.* She further claimed that the school "may not be able to fulfill all of the related service mandates," though she noted that the FNR had not specified the particular class that H.S. would be joining. *Id.* She also argued that the class ratio (6:1:1) would not provide sufficient support and structure for H.S. and that the present levels of performance and goals in the IEP were not adequate to meet his needs. *Id.* Lastly, Plaintiff claimed that Pepe told her that H.S. might receive a Related Services Authorization ("RSA")[8] and that there was "no guarantee" that H.S. would receive the mandated services during the school day. Tr. 1063, 1070-71. The District did not respond to her letter. Tr. 1078-79.

That same day, Plaintiff paid the Rebecca School a $2,500 deposit for the 2011-2012 school year. The next day, on June 22, 2011, she signed a contract to re-enroll H.S at the school. Ex. R; Tr. 826. The tuition for the 2011-2012 school year at the Rebecca School was $94,750 plus an additional $19,845 for the cost of the 1:1 paraprofessional. Ex. 18-1, 18-7; Tr. 826. Plaintiff claims that she is legally obligated to pay tuition, though she is unable to pay the entire amount. As of the filing of the motion papers, Plaintiff had made monthly payments totaling $6,020.

### E. Due Process Complaint

On May 11, 2012, Plaintiff filed a Due Process Complaint ("DPC") challenging the District's IEP and proposed placement and seeking funding for H.S.'s tuition for the 2011–2012 school year at the Rebecca School. Ex. 1. Plaintiff alleged that the District failed to offer H.S. a

---

[8] Schools that cannot provide all mandated services on site typically give parents RSAs. An RSA functions like a voucher, allowing parents to contract with an outside therapist to schedule remaining sessions after the school day at the District's expense.

FAPE for the 2011-2012 school year on both procedural and substantive grounds. *See id.* In her DPC, Plaintiff claimed that, among other things, she was denied a meaningful opportunity to participate in the CSE meeting, and that the District failed to conduct adequate and sufficient evaluations. She further alleged that the IEP contained inadequate present levels of performance and BIP, and unmeasurable goals. *Id.* Plaintiff also argued that the 6:1:1 recommendation would not provide sufficient support for H.S and that Hungerford was not capable of implementing the IEP.

### F.  IHO's Findings

An impartial hearing was convened and took place over six non-consecutive days: June 21, July 20, September 7, October 15, November 19, and December 17, 2012. At the hearing, the District presented the testimony of three witnesses: Dr. Fochetta, Pepe, and Christopher Gullo, H.S.'s expected teacher at Hungerford. Dr. Fochetta testified about the development of the IEP and the appropriateness of its contents as applied to H.S.'s needs and abilities. Pepe testified regarding Hungerford's services and its ability to implement the IEP. Similarly, Gullo provided testimony about his ability to address H.S.'s needs had H.S. joined his class.

For her case, Plaintiff presented five witnesses (including herself). Colleen Gabbert, H.S.'s treating occupational therapist for the 2011-2012 school year, testified about H.S.'s need for OT and the progress he had made at the Rebecca School. Tina McCourt, the Program Director at the Rebecca School, discussed the services provided at the school and those used by H.S. Like McCourt, Gerstein testified about H.S.'s services at the Rebecca School and also discussed the IEP and its development. Gilbert Tippy briefly testified about the different testing available for autistic children. Plaintiff testified last and provided a summary of H.S.'s background and education, the IEP process, and her decision to re-enroll H.S. at the Rebecca

School.  On February 21, 2013, the IHO rendered a decision, finding that the District had failed

to provide H.S. with a FAPE for the 2011–2012 school year.  Impartial Hearing Officer's

Findings of Fact and Decision, Case No. 138792 (Feb. 21, 2013) (Doc. 1, Ex. A) ("IHO") 35.

The IHO analyzed all three prongs of the *Burlington/Carter* test.

First, the IHO found that the IEP did not offer H.S. a FAPE because it suffered from

numerous procedural and substantive deficiencies.[9]  *Id.* at 32.  Specifically, the IHO noted that

the reports relied upon by the CSE were outdated[10] and that despite H.S.'s sensory deficits, no

OT evaluation had been completed.  *Id.* at 31.  The IHO also found that the District's failure to

conduct a functional behavior assessment ("FBA") and include parent counseling and training in

the IEP constituted significant omissions contributing to a denial of a FAPE.  *Id.* at 33.  The IHO

was unpersuaded by Dr. Fochetta's testimony that at the CSE meeting they sufficiently discussed

H.S.'s behaviors.[11]  Instead, the IHO emphasized that the FBA and BIP are created to assist the

individuals working with the student (not the members of the CSE) and that, because of the

missing FBA, the BIP failed to include several of H.S.'s behaviors that interfered with his

learning.  *Id.* at 34.  Though she acknowledged that the failure to include parent training in an

IEP does not usually constitute a denial of a FAPE, the IHO found that the failure here was

---

[9] Shortly before the IHO rendered her decision, the Second Circuit issued *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012), holding that the adequacy of IEPs to provide students with a FAPE was to be evaluated prospectively as of the time IEP was created.  Thus, to determine whether the District's placement was appropriate, the IHO noted that it was limited to evidence regarding how the recommended program would operate so long as it did not provide information that added or otherwise modified the IEP.  *Id.*

[10] The IHO wrongly states that the date of the Rebecca Progress Report was July 2010.  The report was dated December 2010.  *See* IHO 31.

[11] Dr. Fochetta testified that the purpose of an FBA was to "gain an understanding as to why a student is engaging in the behaviors that are identified in the behavior intervention plan."  Tr. 526-27.  She further stated that by the time the CSE discussed H.S.'s BIP, they had an understanding of the reasons for H.S.'s behaviors.  She claimed that she noted these reasons within the body of the BIP instead of conducting or relying on an FBA.  *Id.* at 527.

significant.  *Id.* at 34.  She also noted that the list of parent training and programs offered by

Hungerford, as testified to by Pepe, did not address any of H.S.'s behaviors or needs.

The IHO concluded that as a result of these procedural violations, the IEP did not

accurately provide H.S.'s present level of performance, his needs, and adequate goals.[12]  *Id.*  The

IHO noted that the IEP inaccurately stated that H.S. communicated using PECS and that the OT

and PT would not meet H.S.'s needs.  IHO at 32.  Further, the IHO determined that the annual

goals were directly copied from the previous IEP and did not include any goals to address H.S.'s

ADL needs.

The IHO also concluded that notwithstanding the inadequacy of the IEP, Hungerford

could not implement it as written.  *Id.* at 32.  Based on Pepe and Gullo's testimony about the

possibility that mandated services could be provided outside of the school, the IHO concluded

that Hungerford could not provide the necessary breaks to make H.S. available for learning.  *Id.*

Though she rejected Plaintiff's claim that Hungerford did not have adequate sensory equipment

to implement the IEP, the IHO found that Gullo's claim that they were prohibited from touching

children further buttressed her finding that Hungerford could not address H.S.'s needs.[13]  *Id.* at

33.

---

[12] For this conclusion, the IHO relied on the testimony of McCourt and Gerstein.  At the hearing, McCourt stated that H.S. did not use PECS as a communication system and that it would be inappropriate for H.S. to be placed in a class with kindergarten to first grade level students because they would be functioning above him.  Tr. 801-07.  She also believed the present levels of performance, OT, and PT on the IEP were inadequate because they were vague and did not address H.S.'s abilities.  Gerstein focused on the BIP and the annual goals, stating that the BIP failed to include strategies to address his behaviors and that H.S. had already achieved some of the goals listed in the IEP.  Tr. 914-20.  The IHO was unpersuaded by Dr. Fochetta's explanation that generally IEPs were not required to provide a baseline of a student's functioning ability.  IHO 32.

[13] Specifically, in response to a question about whether joint compression could be done in his classroom, Gullo replied that they were "not really allowed to touch the kids.  That would be going against Board of Ed regulations."  Tr. 438-39.

17

Second, the IHO found that Plaintiff sustained her burden of establishing that the Rebecca School was an appropriate placement for H.S.  The IHO specifically noted the OT and overall sensory diet available to H.S. at the Rebecca School, the significant parent training and counseling, and the progress that H.S. had made while at the school. *Id.* at 35-36.  Third, the IHO also found that the equitable considerations weighed in Plaintiff's favor.  Specifically, the IHO rejected the District's arguments that Plaintiff did not cooperate with the District, that her contract with the Rebecca School was illusory, and that her hearing request was untimely.  *Id.* at 37.  The IHO thus awarded Plaintiff reimbursement and direct funding for the costs of H.S.'s attendance at the Rebecca School.  *Id.* at 39.

### G.  SRO's Findings

The District appealed the IHO's determination that it failed to offer H.S. a FAPE for the 2011-2012 school year, and that the equitable considerations weighed in Plaintiff's favor.[14] Office of State Review Appeal, No. 13-050 (Jan. 27, 2016) (Doc. 1, Ex. B) ("SRO") 5-6. Plaintiff cross-appealed arguing that the IHO findings should be upheld and asserted additional grounds on which the IHO should have found a denial of a FAPE, including the inappropriateness of the 6:1:1 special class with the support of a 1:1 paraprofessional and the physical environment of the school.  On January 27, 2016, the SRO issued her decision, disagreeing with the IHO and concluding that the District did offer H.S. a FAPE for the 2011-2012 school year.  SRO 27.

The SRO first addressed Plaintiff's assertion that she did not have an opportunity to meaningfully participate in the January 2011 CSE meeting.  SRO 8.  After reviewing the record,

---

[14] Defendants did not challenge the IHO's findings that the Rebecca School was an appropriate placement. Accordingly, the SRO did not review that determination.

18

the SRO noted that Plaintiff attended the CSE meeting and testified in detail regarding what was discussed at the meeting.  *Id.*  She also highlighted that the CSE meeting minutes showed that Plaintiff expressed agreement with particular aspects of H.S.'s level of performance and was asked her opinion about H.S.'s reading and math goals, and voiced her disagreement with the 6:1:1 recommendation.  *Id.*  Plaintiff also requested that ADL goals be added to the IEP.  Though the SRO did note Plaintiff's claim that the meeting was abruptly ended once she expressed her objection with the placement recommendation, the SRO concluded that it was not unusual for CSE meetings to end after a recommendation had been made.  *Id.*  Accordingly, the SRO determined that Plaintiff "was provided with, and took advantage of, the opportunity to participate during the CSE meeting."  *Id.* at 8.

The SRO next addressed the sufficiency of the evaluations considered by the CSE.  *Id.* at 10.  The SRO reviewed all of the available materials, noting that "much of the information available to the January 2011 CSE was obtained from the parent" or the Rebecca School, and found that the information contained in the various evaluations was sufficient to create an adequate IEP for H.S.  *Id.*  Reviewing the 2009 social history update, the SRO found that it provided descriptions of H.S.'s "communication, gross motor, pre-academic, social interaction, and ADL skills," as provided by Plaintiff.  *Id.*  The 2009 P-E evaluation provided background information about H.S.'s "medical history, then-current education program," and indicated that H.S. was "untestable."  The evaluation also indicated that H.S. engaged in self-stimulating behaviors, such as rocking, hand flapping, finger flicking, staring at the lights, and screeching. *Id.*  It also contained descriptions of H.S.'s skills as reported by Plaintiff, including that H.S. followed one-step directions, and identified some colors and shapes.  The SRO also found that the 2010 classroom observation did not accurately reflect H.S.'s abilities because his

paraprofessional was not present and indicated that the CSE placed little reliance on this document. *Id.* at 12.

The SRO discussed the information contained in the Rebecca Progress Report in great detail. *Id.* According to the report, H.S. attended a classroom with a ratio of 6:1:2 and received a 1:1 paraprofessional throughout the day. H.S. presented as either "up-regulated" or "under-regulated" and needed constant moving activities or adult support to regain attention and modulate his actions. He also used a "variety of sensory materials/activities including jumping on a trampoline, walking up stairs, rubbing lotion, squishing a therapy ball, swinging on a swing, and receiving joint compression to help maintain regulation." *Id.* According to the speech-language pathologist, H.S. was nonverbal, but was able to, among other things, orient to his name, follow one and two-step related directions and identify preferred items from a field of six. *Id.* at 13. Therapy sessions focused on improving his production of consonants and vowel sounds, and his awareness of oral structures. *Id.* With respect to his gross and fine motor skills, the report indicated that H.S. worked on increasing independence with self-care skills and developing muscle/tone strength, and endurance. He received OT and PT sessions in which the therapists worked on improving H.S.'s ability to "don and doff his shoes" and maneuver through his environment. *Id.*

Of note, the SRO did find that the District failed to evaluate H.S. in all areas of his suspected disability in violation of state and federal regulations. She also acknowledged that although Dr. Fochetta testified that she reviewed all materials prior to the CSE meeting, the 2009 P-E evaluation report was not discussed at the meeting. Nevertheless, the SRO concluded that collectively, the information gathered from the evaluations and the input from Plaintiff and

Gerstein, provided the CSE with sufficient functional, developmental, and academic information about H.S. and his individual needs.  *Id.* at 11, 14.

The SRO then addressed the adequacy of the description in the IEP of H.S.'s present levels of performance.  *Id.* at 14.  She found that it was reasonable for the CSE to rely on the description of H.S.'s present level of performance provided by the Rebecca Progress Report because it was created by staff that interacted with H.S. on a daily basis.  Moreover, the CSE meeting minutes indicated that a draft of the IEP present levels of performance was read aloud during the meeting and was modified by input from Gerstein.  The SRO also noted that H.S.'s communication and social skills, as described in the IEP, were consistent with the information available to the CSE.  Though the SRO acknowledged that Plaintiff preferred that the IEP contain more specific information about H.S.'s sensory abilities and preferred sensory tools, the SRO was persuaded by Dr. Fochetta's testimony that the IEP was "purposefully left fluid and open" to anticipate changes in H.S.'s needs.  *Id.* at 16.  The SRO also rejected Plaintiff's claim that the District's failure to update the IEP to address H.S.'s change in behavior at the start of the school year constituted the denial of a FAPE because she found that the District had not been made aware of any changes to H.S.'s needs.  *Id.* at 16-17.

The SRO also rejected Plaintiff's assertion that the IEP did not provide sufficient goals to address H.S.'s needs relating to social/emotional skills, ADLs, and safety.  *Id.* at 17.  Though the SRO acknowledged that the annual goals as described in the IEP were noncompliant with New York regulations in that they "provided little guidance with regard to the manner in which [H.S.'s] progress was to be measured," she concluded that it did not rise to the level of a denial of a FAPE.  *Id.* at 18-19.  She found that the annual goals, accompanied by several short-term goals and evaluative criteria, were sufficient to guide a teacher in providing H.S. with

instruction.  *Id.* at 19.  The SRO also found that Plaintiff's objections regarding the difficulty of the annual goals were unsupported.  She determined that the goals in the IEP were almost identical to those listed in the Rebecca Progress Report and that any changes made were reasonable expansions to the goals in the report.  *Id.*

In analyzing whether the IEP adequately identified and addressed H.S.'s behaviors, the SRO noted that the parties were in agreement that H.S. engaged in interfering behaviors and thus it was a violation of New York regulations for the District not to conduct an FBA.  The SRO also found that the BIP was not developed in compliance with New York regulations because it lacked "the required specificity regarding baseline measures" of H.S.'s behaviors; the "intervention strategies" to prevent his behaviors and teach alternative behaviors; and the schedule "to be used to measure the effectiveness of the intervention strategies employed."  *Id.* at 22. The SRO also noted that the BIP included in H.S.'s January 2011 IEP was identical to the one included in his April 2010 IEP.  Notwithstanding these violations, the SRO found that the IEP included sufficient information to identify H.S.'s behaviors and that the sensory supports listed were adequate strategies to address them.  *Id.* at 23.  The SRO pointed to the various behaviors listed throughout the IEP and relied on Dr. Fochetta's testimony that the sensory supports were "global in nature" and were meant to assist H.S. in remaining regulated and available to learn.  *Id.*

The SRO also briefly addressed Plaintiff's assertion that the IEP's failure to include parent counseling and training resulted in a denial of a FAPE.  *Id.* at 25.  Though the SRO agreed that the District committed a violation of New York regulations by not including parent counseling and training, she found that nothing in the record indicated that Plaintiff had "specific needs relating to her ability to provide follow-up interventions to [H.S.] at home, such that,

without these services, [H.S.] would not receive a FAPE." *Id.* at 26.  After having assessed all of Plaintiff's procedural claims and noting all of the District's violations, the SRO concluded that the District's procedural violations, considered cumulatively, did not impede H.S. right to a FAPE, significantly impede Plaintiff's opportunity to participate in the decision-making process regarding the provision of a FAPE to H.S., or cause a deprivation of educational benefits.

The SRO next concluded that nothing in the record indicated that the CSE's decision to recommend a 6:1:1 special class placement would not provide H.S. educational benefits.  SRO 24-25.  The SRO explained that a 6:1:1 class ratio was especially intended for "students whose management needs are determined to be high intensive, and requiring a high degree of individualized attention and intervention." *Id.* at 24.  She also noted that the CSE recommended a full-time 1:1 paraprofessional and related services, which would provide additional support for H.S.  The record indicated that at the Rebecca School, H.S. attended a 6:1:2 class with a 1:1 paraprofessional -- a configuration not entirely different than the one recommended by the CSE. The SRO was unpersuaded by Gerstein's testimony that a 6:1:1 placement was inappropriate for H.S. and characterized her objections as addressing Hungerford's ability to implement the IEP and not about the actual 6:1:1 recommendation.  *Id.* at 25.

Lastly, the SRO turned to Plaintiff's challenges to the recommended placement at Hungerford.  SRO 26-27.  Relying in part on the Second Circuit's decision in *R.E.*, 694 F.3d 167, the SRO concluded that Plaintiff could not prevail on her claims regarding implementation of the IEP because she had rejected the assigned placement prior to the time the January 2011 IEP was scheduled to be implemented.  She stated that because Plaintiff never enrolled H.S. at Hungerford, any conclusions that the District would have been unable to implement the IEP would "necessarily be based on impermissible speculation." *Id.* at 27.

Having found that the District satisfied its burden to establish that it offered H.S. a FAPE for the 2011-2012 school year, the SRO sustained the District's appeal, dismissed Plaintiff's cross-appeal, and ordered that the IHO's decision be modified to the extent that it directed the District to directly fund H.S's tuition at the Rebecca School for the 2011-2012 school year.  SRO 28.[15]

### H.  This Action

On August 10, 2015, Plaintiffs filed the Complaint in this action, seeking reversal of the SRO's decision.  (Doc. 1)  On February 9, 2016, the Court received the administrative record, which was filed under seal.  (Doc. 19)  The parties cross-moved for summary judgment (Docs. 21, 27), and on June 7, 2016, the motions were fully briefed.

## III.  STANDARD OF REVIEW

Upon an aggrieved party's appeal of the SRO's decision to the federal district court, the court must review the entirety of the administrative record in addition to supplemental evidence upon either party's request.  20 U.S.C. § 1415(i)(2)(C)(i)–(ii).[16]  Though IDEA appeals tend to come before the district court as a motion for summary judgment, the existence of a genuine issue of material fact does not necessarily result in denial of the motion.  *See, e.g.*, *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  "Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in [the] IDEA [in developing the specific IEP at issue] and determining whether the challenged IEP is reasonably calculated to enable the child to receive educational

---

[15] The SRO made her determination without deciding whether the Rebecca School was an appropriate placement or whether equitable considerations supported Plaintiff's requested relief.  SRO 27.

[16] The parties did not submit any supplemental evidence here, instead relying exclusively on the administrative record.

benefits." *M.H.*, 685 F.3d at 225–26.  "Though the parties in an IDEA action may call the procedure 'a motion for summary judgment,' the procedure is in substance an appeal from an administrative determination, not a summary judgment [motion]." *Id*. at 226.

Courts reviewing administrative decisions under the IDEA must determine whether the decision is supported by a preponderance of the evidence. *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003).  This review is not, however, "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.  Rather, "[t]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *C.F.*, 746 F.3d at 77 (quoting *Gagliardo*, 489 F.3d at 112–13).  Both the Supreme Court and the Second Circuit "have interpreted the IDEA as strictly limiting judicial review of state administrative decisions." *Grim*, 346 F.3d at 380–81 (citing *Rowley*, 458 U.S. at 204–08; and *Walczak*, 142 F.3d at 129).  This Court must therefore "give 'due weight' to the administrative proceedings, 'mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Id.* at 381 (quoting *Walczak*, 142 F.3d at 129).  "The standard of review 'requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review.'" *C.F.*, 746 F.3d at 77 (quoting *M.H.*, 685 F.3d at 244).

As the Second Circuit has articulated, the level of deference owed by this Court to the administrative findings below must "hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive." *M.H.*, 685 F.3d at 244.  Most critically, the "deference owed depends on both the quality of the opinion and the court's institutional competence." *C.F.*, 746 F.3d at 77.  The Court "must defer to the SRO's decision

on matters requiring educational expertise unless it concludes that the decision was inadequately

reasoned," *R.E.*, 694 F.3d at 189, and the Court's "determination of the persuasiveness of an

administrative finding must also be colored by an acute awareness of institutional competence

and role," *M.H.*, 685 F.3d at 244.  Thus, for example:

> [D]eterminations regarding the substantive adequacy of an IEP should be afforded
> more weight than determinations concerning whether the IEP was developed
> according to the proper procedures.  Decisions involving a dispute over an
> appropriate educational methodology should be afforded more deference than
> determinations concerning whether there have been objective indications of
> progress.  Determinations grounded in thorough and logical reasoning should be
> provided more deference than decisions that are not.  And the district court should
> afford more deference when its review is based entirely on the same evidence as
> that before the SRO than when the district court has before it additional evidence
> that was not considered by the state agency.

*M.H.*, 685 F.3d at 244 (citations omitted).

Finally, courts "defer to the final decision of the state authorities, even where the

reviewing authority disagrees with the hearing officer." *Id.* at 241; *see also Matrejek v. Brewster

Cent. Sch. Dist.*, 471 F. Supp. 2d 415, 426 (S.D.N.Y. 2007), *aff'd*, 293 F. App'x 20 (2d Cir.

2008) (deferring to the SRO's determination because doing otherwise would invite the court to

substitute its "own uninformed judgment for the opinions of persons with far greater expertise

without having any basis to do so").  "If the SRO's decision conflicts with the earlier decision of

the IHO, the IHO's decision may be afforded diminished weight." *E.A.M.*, 2012 WL 4571794,

at *5 (internal quotation marks omitted).  However, if the district court concludes that the SRO's

determinations are "insufficiently reasoned to merit that deference," the court may "consider the

IHO's analysis, which is also informed by greater educational expertise than that of judges,

rather than [] rely exclusively on its own less informed educational judgment." *M.H.*, 685 F.3d

at 246.

## IV.  DISCUSSION

Plaintiff asks the Court to defer to the IHO's decision and find that the District failed to offer H.S. a FAPE for the 2011-2012 school year, that the Rebecca School was an appropriate placement for H.S., and that Plaintiff is entitled to direct payment of H.S.'s tuition. Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment (Doc. 22) ("Pl. Memo") at 1-2.  In support of her claim that the District failed to provide H.S. with a FAPE, Plaintiff challenges the IEP (both procedurally and substantively) and the recommended placement at Hungerford.  Defendants ask the Court to defer to the decision of the SRO and thus find that Plaintiff is not entitled to reimbursement.  Defendants' Memorandum of Law in Support of Motion for Summary Judgment (Doc. 28) ("Defs. Memo") at 1-2.

### A.  Scope of Plaintiff's Challenges

As an initial matter, Defendants argue that Plaintiff should not be allowed to assert claims in the moving papers that she did not include in the DPC.  Defs. Memo at 19-20.  Specifically, Defendants claim that Plaintiff's challenges concerning the 1:1 paraprofessional recommendation, the related services mandates, Hungerford's alleged ban on touching, the instructional methodology used at Hungerford, and its alleged lack of instructional lunch – made for the first time in the motion for summary judgment – are improperly before this Court.  In response, Plaintiff claims that Defendants misconstrued her arguments.  She asserts that she is not challenging the appropriateness of either the 1:1 recommendation or the mandated related services.  Instead, she challenges the IEP's recommendation as a whole and its ability to provide a FAPE to H.S.  Plaintiff next argues that the lack of instructional lunch was covered by her challenge to Hungerford's ability to implement the BIP and the District opened the door to this claim by questioning its witnesses about H.S.'s ability to remain focused on food.  Plaintiff's

Memorandum of Law in Opposition and Reply to Defendants' Cross-Motion for Summary Judgment ("Pl. Opp.") at 5.  Lastly, Plaintiff concedes that her claims regarding the educational methodologies employed by Hungerford and its alleged ban on touching was not raised in the DPC.  Nevertheless, she claims that it was proper for her to inquire about how sensory support would be implemented and that the District once again opened the door by questioning its witnesses about the methodologies employed at Hungerford.  *Id.* at 6.

Generally, the party requesting a due process hearing "shall not be allowed to raise issues at the . . . hearing that were not raised in the notice . . . unless the [opposing] party agrees otherwise."  20 U.S.C. § 1415(f)(3)(B); *see also B.P. v. N.Y.C. Dep't of Educ.,* 841 F.Supp.2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial hearing request or agreed to by Defendant.").  "Failure to exhaust the [administrative] remedies provided in [the IDEA's] review process . . . deprives a federal court of subject-matter jurisdiction to consider the claim on appeal from the SRO."  *A.M.,* 964 F. Supp. 2d at 283 (citing *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 243 (2d Cir. 2008)).  Nevertheless, the District is not permitted to argue issues outside the scope of the DPC to meet its burden, "without opening the door" for Plaintiff to also address these typically foreclosed issues.  *M.H.*, 685 F.3d at 251.

Though Plaintiff's challenges may not be entirely outside of the scope of the DPC or the investigation, the Court finds that her challenges are nonetheless impermissible.  Plaintiff's claims relating to the educational methodologies used and the alleged ban on touching, are retrospective challenges to the appropriateness of Hungerford as the proposed placement for H.S. Here, Plaintiff was unaware of these alleged facts at the time she rejected Hungerford and thus, cannot rely on these assertions to challenge the proposed placement.  *See M.O.*, 793 F.3d at 244

("Challenges to a school district's proposed placement school must be evaluated prospectively (*i.e.* at the time of the parents' placement decision) and cannot be based on mere speculation.") Further, the IEP does not recommend that he receive instructional lunches nor that a specific teaching methodology be employed.  As such, the Court will not consider these challenges in its assessment of Hungerford as an appropriate placement for H.S.

### B.  Procedural Challenges to the IEP

Plaintiff first challenges the procedural adequacy of the IEP.  In determining whether an IEP is adequate, courts first examine whether the state has complied with the procedures mandated by the IDEA.  *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).  This inquiry is "no mere formality," since "adequate compliance with the procedures prescribed w[ill] in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  *Walczak*, 142 F.3d at 129 (internal quotation marks omitted).  At the same time, not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA."  *A.C.*, 553 F.3d at 172.  A procedural violation renders an IEP legally inadequate only when the violation (1) "impeded the child's right to a [FAPE]," (2) "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE]," or (3) "caused a deprivation of educational benefits."  *E.A.M.*, 2012 WL 4571794, at *6 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)); *see also Werner v. Clarkstown Cent. Sch. Dist.*, 363 F. Supp. 2d 656, 659 (S.D.N.Y. 2005) (finding that procedural violations "do not automatically require a finding of a denial of a FAPE.").

Here, Plaintiff alleges two procedural violations:  (1) that the CSE failed to fully evaluate H.S. and to consider sufficient, appropriate, evaluative material in developing his IEP; and (2)

that she was not given a meaningful opportunity to participate in the CSE meeting.  Pl. Memo. at

13-18.  In opposition, the District asserts that, as the SRO found, the evaluative materials on

which the CSE relied were sufficient to develop a program that offered H.S. a FAPE and that

Plaintiff actually participated in the CSE meeting.  Defs. Memo at 21-30.  Though the District

concedes that it committed several procedure violations, it argues that the SRO was correct in

finding that the procedural violations did not render the IEP legally inadequate.  *Id.* at 30-31.

### 1.  Sufficiency of the Material Reviewed by the CSE

Plaintiff makes two arguments with respect to the information used to create the IEP:  (1)

that the CSE did not have sufficient information on which to rely because it failed to conduct

necessary evaluations and behavioral assessments;[17] and (2) that some of the reports on which

the CSE actually relied were inadequate.  Pl. Memo at 13, 15.[18]  Plaintiff further argues that the

SRO committed reversible error when it failed to assess the cumulative effect of the District's

multiple procedural violations.  *Id.*

When developing a student's IEP, the CSE must review "existing evaluation data on the

child, including (i) evaluations and information provided by the parents of the child; (ii) current

---

[17] Plaintiff claims that the District's failure to conduct an FBA resulted in an inappropriate Behavior Intervention Plan ("BIP"), "incapable of adequately addressing H.S.'s interfering behaviors and failed to identify several of H.S.'s behaviors, such as jumping, loud vocalizations, and rocking behaviors."  Pl. Memo at 17.

[18] Additionally, Plaintiff asserts that neither she, nor the Rebecca School, were given an opportunity to determine what evaluations were needed to develop the IEP.  Pl. Memo at 14.  However, the Court finds no support in the record for this claim.  The IDEA requires that the parent of a child with a disability "be given an opportunity 'to examine all records relating to [their] child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to [their] child, and to obtain an independent evaluation of the child.'"  *J.P. v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 3078 (ERK), 2012 WL 359977, at *8 (E.D.N.Y. Feb. 2, 2012) (quoting 20 U.S.C. § 1415(b)(1)).  As noted previously, upon review of the available materials, the CSE, including the parent, can determine whether additional materials are necessary to develop an adequate IEP.  Here, the hearing record shows that the evaluative materials were provided by either Plaintiff or the Rebecca School.  Further, nothing in the record indicates that upon review of the available materials at the CSE meeting, any participants expressed a need for more evaluations.  Accordingly, the Court finds that Plaintiff was not precluded from participating in the determination of the adequacy of the evaluative information available to the CSE.

classroom-based, local, or State assessments, and classroom-based observations; and (iii)

observations by teachers and related service providers."  20 U.S.C. § 1414(c)(1)(A); *see* 8

N.Y.C.R.R. § 200.4(b)(5)(i).  "[O]n the basis of that review, and input from the child's parents,"

the CSE must then "identify what additional data, if any, are needed to determine," among other

things, "the educational needs of the child," "the present levels of academic achievement and

related developmental needs of the child," and "whether the child needs special education and

related services."  20 U.S.C. § 1414(c)(1)(B); *see* 8 N.Y.C.R.R. § 200.4(b)(5)(ii).  If the CSE

determines that "no additional data are needed to determine . . . the child's educational needs,"

the district is not "required to conduct such an assessment unless requested by the child's

parents."  20 U.S.C. § 1414(c)(4); *see* 8 N.Y.C.R.R. § 200.4(b)(5)(iv).  In other words, "[a]ny

additional assessments need only be conducted if found necessary to fill in gaps in the initial

review of existing evaluation data."  *D.B. ex rel. E.B. v. N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d

315, 329–30 (S.D.N.Y. 2013); *see also T.F. ex rel. M.F. v. N.Y.C. Dep't of Educ.*, No. 14 Civ.

3401 (WHP), 2015 WL 5610769, at *4 (S.D.N.Y. Sept. 23, 2015).  Unless the CSE identifies

such a "gap," or the parents and district agree otherwise, the IDEA requires only that a child with

a disability be evaluated at least once every three years, and not more frequently than once a

year.  20 U.S.C. § 1414(a)(2)(B); 8 N.Y.C.R.R. § 200.4(b)(4); *see D.B.*, 966 F. Supp. 2d at 329.

When a child exhibits behavior that significantly "impedes the child's learning or that of

others," the District is required to conduct an FBA, "as necessary, to ascertain the physical,

mental, behavioral and emotional factors which contribute to the suspected disabilities."  8

NYCRR § 200.4(b)(1)(v).  An FBA should include an "identification of the problem behavior,

the definition of the behavior in concrete terms, the identification of the contextual factors that

contribute to the behavior . . . and the formulation of a hypothesis regarding the general

31

conditions under which a behavior usually occurs and probable consequences that serve to maintain it."  8 NYCRR § 200.1(r).  In addition to conducting an assessment, the CSE "shall consider the development of a behavioral intervention plan."  8 NYCRR § 200.22(b).

The Second Circuit has found that failure to conduct an FBA is "a serious procedural violation" because it may prevent the CSE "from obtaining necessary information about the student's behaviors," leading to a flawed IEP.  *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012).  However, "[f]ailure to conduct an FBA does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior."  *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013).  "[W]hether an IEP adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are 'precisely the type of issue[s] upon which the IDEA requires deference to the expertise of the administrative officers.'"  *Id.* (citing A.C., 553 F.3d at 172).

Here, the information available at the time of the CSE meeting included H.S.'s IEP for the prior school year (2010-2011), a December 2010 Rebecca School Progress report, an October 2010 classroom observation report, 2009 P-E evaluation, and a 2009 social history update.  SRO at 11.  The parties do not dispute that because of H.S.'s history of disability, the District should have conducted additional evaluations.  In fact, the SRO found that the district court had failed to evaluate H.S. in all areas of suspected disability as required by statute.  SRO at 10 n.6.  The SRO also noted that the District failed to conduct an FBA despite knowing that H.S. exhibited significant interfering behaviors.  *Id.*

Nevertheless, the SRO concluded that "the available information regarding the student's functional, developmental, and academic needs was sufficient to enable the January 2011 CSE to

develop an IEP." SRO at 10. The Court finds that the SRO's analysis is persuasive and supported by the record. The SRO thoroughly analyzed the hearing record, providing a detailed description of the information that each individual report and evaluation contained. The SRO also acknowledged the shortcomings of both the 2009 P-E evaluation report and the classroom observation. Specifically, she noted that the examiner for the P-E evaluation reported that H.S. was untestable and that his attempts at conducting formal assessments were discontinued when it "became apparent" that H.S. "could not comply with the demands of the formal testing situation." SRO at 12. Importantly, however, the SRO stated that the P-E evaluation had not been discussed at the CSE meeting. SRO at 13. The SRO also highlighted that the 2010 classroom observation was completed at a time when H.S.'s paraprofessional was not present and that the observation stated that H.S. was "somewhat more withdrawn" as a result. *Id.* The CSE "placed little reliance on this document," therefore, because the classroom observation did not accurately reflect how H.S. would have behaved on a typical day with his paraprofessional. SRO at 12. In addressing the District's failure to conduct an FBA, the SRO identified multiple places throughout the IEP in which H.S.'s interfering behaviors were discussed. Indeed, Plaintiff's claim that the BIP did not contain all of H.S.'s behaviors is weakened, as the SRO notes, by their inclusion in other sections within the IEP.

Thus, although the Court finds that the District violated the IDEA by not conducting the additional evaluations in all areas of H.S.'s suspected disability, it defers to the SRO's well-reasoned conclusion that this procedural violation, alone, does not rise to the level of a denial of a FAPE. *See S.Y. v. N.Y. City Dep't of Educ.*, No. 15 Civ. 6277 (AT), 2016 WL 5806859, at *5 (S.D.N.Y. Sept. 28, 2016) (finding that procedural violation existed because of DOE's failure to conduct additional evaluations, but deferring to SRO's finding that violation was insufficient to

invalidate IEP); *J.C. ex rel. C.C. v. N.Y.C. Dep't of Educ.*, No. 13 Civ. 3759 (PGG), 2015 WL 1499389, at *16 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 643 F. App'x 31 (2d Cir. 2016) ("Because the SRO properly concluded that C.C.'s behavior does not seriously interfere with classroom instruction, and because the IEP adequately addresses C.C.'s minor behavioral issues, no FBA or BIP was necessary.").

### 2.  Parent Participation[19]

Plaintiff asserts that the IEP was procedurally deficient because she was not given a meaningful opportunity to participate in the CSE.  She claims that upon disagreeing with the 6:1:1 placement, the CSE meeting ended abruptly without further discussion of her concerns. Pl. Memo at 28.

The IDEA requires that "parents of a child with a disability be given an opportunity 'to examine all records relating to [their] child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to [their] child.'"  *J.P. v. N.Y.C. Dep't of Educ.*, No. 10 Civ. 3078 (ERK), 2012 WL 359977, at *8 (E.D.N.Y. Feb. 2, 2012) (quoting 20 U.S.C. § 1415(b)(1)).  "The CSE may consider and reject the Parent's point of view, but it may not deprive the Parent of meaningful participation by refusing to consider or the Parent's concerns."  *E.H. v. N.Y. City Dep't of Educ.*, 164 F. Supp. 3d 539, 551 (S.D.N.Y. 2016).

---

[19] Though in the DPC Plaintiff asserted that the IEP failed to include parent counseling and training, she does not specifically address this claim in her motion papers.  Instead, Plaintiff claims the District's procedural violations, including its failure to include parent training in the IEP, cumulatively, amounted to a denial of a FAPE.  The SRO did acknowledge the District's failure to include any mention of parent counseling or training in the IEP, however, she concluded that this violation did not amount to a denial of a FAPE, in part, because the record was devoid of any evidence that Plaintiff had specific needs relating to her ability to provide follow-up interventions to H.S. at home. SRO 26.  The SRO's conclusion is thus upheld.  *See B.P. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 1822 (LGS), 2014 WL 6808130, at *10 (S.D.N.Y. Dec. 3, 2014), *aff'd*, 634 F. App'x 845 (2d Cir. 2015) (holding that a failure to include parental training in an IEP is not "outcome determinative" and thus "insufficient, on its own, to amount to a FAPE denial").

Here, the SRO noted that Plaintiff attended the CSE meeting and testified regarding what was discussed.  Pl. Memo at 9.  The CSE meeting minutes also indicate that Plaintiff expressed agreement with some aspects of the present level of performance and that her opinion was sought with regard to H.S.'s reading and math goals.  *Id.*  The record also suggests that the ADL goals were added at Plaintiff's request.  *Id.*  Though the SRO acknowledged Plaintiff's claim that she was not given an opportunity to discuss her objections to the 6:1:1 recommendation, the SRO found that she had been an afforded an opportunity to participate in the CSE meeting.  She explained that while it was unfortunate that Plaintiff felt that her objection caused the meeting to end, she had not been significantly impeded from participating.  *Id.*  The SRO made no mention of whether Plaintiff's concerns regarding the 6:1:1 recommendation were actually discussed by the CSE.

Though the Court finds that the SRO did not adequately address whether the CSE considered other options for H.S., a review of the record indicates that the CSE did in fact consider other options.  First, the IEP specifically states that 12:1:1 and 8:1:1 placements were considered.  Ex. 4.  Second, Dr. Fochetta confirmed during her testimony that these class ratios were "ruled out" at the very beginning of the CSE meeting because they were too large and overwhelming for H.S.  Tr. 555.  Dr. Fochetta also stated that a 6:1:1 class ratio without a 1:1 paraprofessional was also considered and rejected because it would not provide H.S. with sufficient support.  *Id.*  Thus, the Court finds that Plaintiff was not denied a meaningful opportunity to participate in the development of the IEP.

### 3.  Cumulative Effect of Procedural Violations

Plaintiff claims that the SRO failed to consider the cumulative effect of all of the District's procedural violations. Pl. Memo at 24.  She asserts that the District's failure to further

35

conduct evaluations and allow her to meaningfully participate resulted in the development of an IEP that did not accurately identify his behaviors or needs and improperly recommended a 6:1:1 class placement.  *Id.* at 26.  Plaintiff thus urges the Court to defer to the IHO's conclusion that the multiple procedural violations resulted in a denial of a FAPE to H.S.  IHO 31.  Defendants argue that the Court should defer to the SRO's conclusion that the District's failure to conduct an FBA, develop a BIP in accordance with New York regulations, and include parent counseling and training in the IEP did not amount to a denial of a FAPE, or significantly impede Plaintiff's opportunity to participate in the decision-making process.  SRO 26.

As an initial matter, Plaintiff's representation of the procedural violations the Court should consider in its analysis is incorrect.   The Court must consider only the cumulative effect of the determined, rather than the alleged, procedural violations.  *See R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 192-196 (2d Cir. 2012).  To that end, the determined procedural violations are comprised of failures to:  conduct an FBA, develop a BIP in accordance with New York regulations, include parent counseling and training in the IEP, evaluate H.S. in all areas of his suspected disability in preparation for the CSE meeting.  SRO 10.  The District's failure to sufficiently evaluate H.S., like the District's failure to conduct an FBA and develop an adequate BIP, is significant as it prevents the CSE from "obtaining necessary information about the student's behaviors, leading to their being addressed in the IEP inadequately or not at all."  *R.E.*, 694 F.3d at 190.  The remaining procedural violation, the District's failure to include parent training or counseling in the IEP, is "less serious" because the presence or absence of a parent-counseling provision "does not necessarily have a direct effect on the substantive adequacy" of the IEP.  694 F.3d at 191.

Taken together the Court finds that the District's procedural violations do not amount to a denial of a FAPE. Though the SRO did not expressly address the cumulative effect of the District's procedural violations, her analysis with respect to the individual violations is instructive here. The SRO found that the individual violations did not amount to a denial of a FAPE, in pertinent part, because the CSE relied heavily on the Rebecca Progress Report and Plaintiff's and Gerstein's input during the meeting. The Rebecca School and Plaintiff, H.S.'s mother, are, arguably, in the best position to provide information regarding H.S.'s abilities and needs. Here, the hearing record indicates that the CSE received significant information from Plaintiff and Gerstein and that it gave an appropriate amount of weight to the Rebecca Progress Report. Importantly, though Plaintiff asserts that the Rebecca Progress Report would have expired before the implementation of the January 2011 IEP, nothing in the record indicates that any objections were made to the CSE's reliance on the report. Indeed, both Plaintiff and Gerstein helped modify the information provided in the report to reflect H.S.'s needs for the 2011-2012 year. Accordingly, the Court finds that the District's procedural violations, taken as a whole, do not amount to a denial of a FAPE or significantly impeded Plaintiff's opportunity to participate in the decision-making process. *See e.g.*, *P.L. v. N.Y.C. Dep't of Educ.*, 56 F. Supp. 3d 147, 163 (E.D.N.Y. 2014) ("In sum, the three procedural flaws with the IEP found by the Court, *i.e.,* the absence of a vocational assessment, the failure to conduct an FBA, and the lack of provisions for parent counseling, neither separately nor cumulatively rise to the denial of a FAPE."); *see also, R.E.,* 694 F.3d at 193 (concluding that IEP's failure to provide for parent counseling and deficiencies in FBA did not cumulatively amount a violation of the IDEA).

### C. Substantive Challenges

Plaintiff next challenges the substantive adequacy of the IEP.  An IEP is substantively adequate if it "provide[s] personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction."  *D.D-S. v. Southold Union Free Sch. Dist.*, No. 09 Civ. 5026 (JS), 2011 WL 3919040, at *11 (E.D.N.Y. Sept. 2, 2011) (quoting *Rowley*, 458 U.S. at 203), *aff'd*, 506 F. App'x 80 (2d Cir. 2012).

When deciding whether a school district has met its obligations under the IDEA, a court "must examine the record for any objective evidence indicating whether the child is likely to make progress or regress under the proposed plan."  *Cerra*, 427 F.3d at 195 (internal quotation marks omitted).  A court cannot choose, however, between the competing views of experts on matters of educational policy or substitute its own judgment for that of the hearing officers which it reviews.  *Id.* (citing *Briggs v. Bd. of Educ. of Conn.*, 882 F.2d 688, 693 (2d Cir. 1989)). Questions of an IEP's substantive adequacy are thus ones in which "substantial deference is owed to the judgments of state administrative officers."  *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015) (citing *Cerra*, 427 F.3d at 191).  "[C]ourts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."  *Id.* (quoting *Rowley*, 458 U.S. at 208); *see also Cerra*, 427 F.3d at 195 ("Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy."); *Grim*, 346 F.3d at 382 ("[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of administrative officers.").

Here, Plaintiff raises three substantive challenges to the SRO's findings:  (1) that the IEP failed to fully and accurately reflect H.S.'s then-current levels of performance and needs; (2) that

the IEP goals were inappropriate and insufficient for H.S.; and (3) that the 6:1:1 class ratio did

not provide adequate support for H.S.  Pl. Memo at 18.

### 1.  Accuracy of the Levels of Performance and Needs

Plaintiff argues that the IEP failed to fully and accurately reflect H.S.'s then-present

levels of performance and individual needs, as is required by the IDEA.  Pl. Memo at 19; *see* 20

U.S.C. § 1414(d)(1)(A)(i); 8 N.Y.C.R.R. § 200.4(d)(2)(i).  Specifically, Plaintiff asserts that the

IEP described H.S. vaguely as "pre-academic" and thus did not fully describe H.S.'s abilities.

She also argues that the IEP did not indicate how often H.S. required sensory input or what

sensory tools would be used, and did not specify H.S.'s primary mode of communication.  *Id.* at

19-20.  Lastly, Plaintiff claims that the SRO engaged in improper burden shifting when she noted

that the District was not made aware of any changes in H.S.'s needs subsequent to the CSE

meeting.  *Id.* at 20.

As a general matter, and as the SRO noted, an IEP is required to provide the child's

present levels of academic achievement and functional performance," including "how the child's

disability affects the child's involvement and progress in the general education curriculum."  20

U.S.C. § 1414(d)(1)(A)(i)(I); 8 N.Y.C.R.R. 200.4(d)(2)(i).  Importantly, "[e]very aspect of a

student's specific educational issues does not need to be detailed in the IEP, as long as the IEP

[is] designed to specifically address those issues."  *GB v. N.Y.C. Dep't of Educ.*, 145 F. Supp. 3d

230, 250 (S.D.N.Y. 2015).

Upon review of the record, the SRO found that the IEP accurately reflected H.S.'s

present level of performance.  SRO 17.  Specifically, the SRO noted that a draft of H.S.'s present

level of performance was read aloud at the CSE meeting and that the draft was modified "with

teacher input."  SRO 15.  The CSE meeting minutes also indicated that H.S.'s academic level

was discussed and "agreed upon in all areas" and that his social/emotional levels of performance were revised to reflect observations by Gerstein.  *Id.*  Addressing the IEP itself, the SRO explained in great detail how the IEP accurately described H.S.'s communication and social skills, health and physical development levels, and sensory needs.  SRO 15-16.  The SRO also found that the fact that the IEP did not include specific sensory tools was not improper in that it allowed for flexibility in addressing H.S.'s needs.  SRO 16.  The SRO also rejected Plaintiff's assertion that the IEP was inadequate because it did not reflect H.S.'s changes in abilities and needs that occurred after the CSE meeting.  SRO 16.  She found that nothing in the record indicated that the District was made aware of any significant changes.

The Court defers to the SRO's well-reasoned and thorough analysis.  Moreover, Plaintiff's claim that the SRO improperly shifted the burden of proof regarding H.S.'s then-present levels of performance is unavailing.  As Defendants correctly note, the IEP must be evaluated prospectively as of the time of its drafting.  Def. Memo at 40; *see also* 973 F. Supp. 2d 344, 361 (S.D.N.Y. 2013).  Thus, Plaintiff cannot challenge the adequacy of H.S.'s January IEP by claiming that his needs and abilities changed by the time the IEP was to be implemented in July.  *See generally*, *R.E.*, 694 F.3d at 195.  Accordingly, the Court agrees with the SRO's analysis and finds that the IEP adequately stated H.S.'s then-present levels of performance.

## 2.  Appropriateness of the Goals and Objectives

Pursuant to the IDEA and its regulations, an IEP must include "short-term and long-term academic and nonacademic goals for each student, as well as evaluative procedures for measuring a student's progress in achieving the short-term and long-term goals."  *P.G. v. New York City Dep't of Educ.*, 959 F. Supp. 2d 499, 512; *see also* 20 U.S.C. § 1414(d)(1)(A)(i)(II)-(III); 34 C.F.R. § 300.320(a)(2)-(3); 8 N.Y.C.R.R. § 200.4(d)(2)(iii)-(iv).  An IEP's goals must

be designed to both meet "the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum and to meet each of the child's other educational needs that result from the child's disability." *C. W.*, 2016 WL 1230794, at *5 (quoting *C.H. v. Goshen Cent. Sch. Dist.*, No. 11 Civ. 6933 (CS), 2013 WL 1285387, at *12 (S.D.N.Y. Mar. 28, 2013). "[T]he sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003). Accordingly, courts in this Circuit are generally "reluctant to find a denial of a FAPE based on failures in IEPs to identify goals or methods of measuring progress." *L.B. v. N.Y. City Dep't of Educ.*, No. 15 Civ. 03176 (AJN), 2016 WL 5404654, at *17 (S.D.N.Y. Sept. 27, 2016) (citing *G.B.*, 145 F. Supp. 3d at 251).

Plaintiff asserts that the annual goals were vague and immeasurable because they did not provide a baseline. Pl. Memo at 21. She also claims that the IEP did not include ADL goals to address H.S.'s safety issues or specific social/emotional goals. Plaintiff also believed that H.S. would be unable to perform the certain OT tasks. *Id.* at 21. She furthers her claim by relying on testimony from Gerstein that the Rebecca Progress Report was created for a six-month period and would have expired by July 2011, when the IEP would have been implemented. *Id.* at 21-22.

As noted previously, the IEP included twelve annual goals supported by approximately thirty-five short-term objectives in the areas of reading, math, OT, PT, speech and language therapy, and ADLs. The IEP also provides management mechanisms to assist H.S. in working towards and meeting these goals. Upon review of the record, the SRO found that while the annual goals should have included the required elements, the corresponding short-term

objectives were sufficiently detailed to "guide a teacher in providing [H.S.] with instruction."
SRO 19.  Citing to caselaw in this Circuit, she also noted that neither the IDEA nor New York
regulations required that a baseline be included in an IEP.  *See R.B. v. N.Y. City Dep't of Educ.*,
No. 12 Civ. 3763 (AJN), 2013 WL 5438605, at *13 (S.D.N.Y. Sept. 27, 2013), *aff'd*, 589 F.
App'x 572 (2d Cir. 2014).  The SRO also provided a detailed explanation as to the adequacy of
the goals listed in the IEP.  She found that the CSE properly relied on (and recycled) the goals
listed in the Rebecca Progress Report because H.S. had not met many of the goals by the time of
the CSE meeting.  The SRO also determined that the CSE reasonably expanded those goals as
needed for H.S.'s January IEP.  SRO 19.  Though the SRO acknowledged that the IEP did not
include goals specifically labelled social/emotional goals or needs, she found that H.S.'s
social/emotional needs were "primarily related to his communication deficits," which were
adequately addressed by speech-language goals and H.S.'s sensory needs.  SRO 20.

Accordingly, the Court defers to the SRO's thorough and well-reasoned decision.

### 3.   Appropriateness of the 6:1:1 Class Recommendation

Pursuant to New York law, "[t]he maximum class size for special classes containing
students whose management needs are determined to be highly intensive, and requiring a high
degree of individualized attention and intervention, shall not exceed six students, with one or
more supplementary school personnel assigned to each class during periods of instruction."  8
N.Y. Comp. R. & Regs. § 200.6(h)(4) (ii)(a).  Courts in this district have found that challenges to
class size and student teacher ratios "involve questions of methodology more appropriately
answered by the state and district decision-makers than by federal judges."  *P.S. v. N.Y. City
Dep't of Educ.*, No. 13 Civ. 04772 (LGS), 2014 WL 3673603, at *10 (S.D.N.Y. July 24, 2014)

(citing *M.L. v. New York City Dep't of Educ.,* No. 13 Civ. 00574 (ALC), 2014 WL 1301957, at *

11 (S.D.N.Y. Mar. 31, 2014)).

Plaintiff claims that the 6:1:1 class recommendation with a 1:1 paraprofessional was

inappropriate because it did not address H.S.'s management needs.  *Id.* at 23.  In support of her

argument, Plaintiff cites to testimony from Gerstein explaining based on her experience H.S.'s

sensory needs would not have been met in a 6:1:1 placement.  *Id.* at 23-24.

However, after a thorough and well-reasoned analysis of the record, the SRO concluded

that a 6:1:1 class placement with a 1:1 paraprofessional and the related services was adequate to

meet H.S.'s needs and make him available for learning.  The SRO highlighted that the CSE

recommended a "significant level of related services" in addition to the highly restrictive class

setting.  She also noted that H.S.'s class size at the Rebecca School did not differ greatly from

the one recommended in the IEP and that nothing in the record indicated that H.S. needed more

than the support his 1:1 paraprofessional would provide.  The SRO's conclusion is "exactly the

sort of policy judgment on which the Second Circuit has instructed that this court should defer to

the SRO."  *C.W. v. City Sch. Dist. of the City of N.Y.*, 171 F. Supp. 3d 126, 135 (S.D.N.Y. 2016);

*M.H. v. New York City Dep't of Educ.,* No. 10 Civ. 1042 (RJH), 2011 WL 609880, at *12

(S.D.N.Y. Feb. 16, 2011) (quoting *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 129

(2d Cir. 1998)).

### D.  Placement Challenges

Plaintiff argues, and Defendants do not contest, that the SRO improperly dismissed

Plaintiff's claims regarding the adequacy of Hungerford to meet H.S.'s needs, because H.S.

never attended the school.  Pl. Memo at 32-33.  Shortly after the SRO rendered her decision, the

Second Circuit clarified that while "[s]peculation that the school district will not adequately

adhere to the IEP is not an appropriate basis for unilateral placement," *R.E.*, 694 F.3d at 195, it was not speculative to "prospective[ly] challenge[] a proposed placement school's capacity to implement a child's IEP," *M.O.*, 793 F.3d at 244; *see also M.T. ex rel. H.T. v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 10124 (GHW), 2016 WL 1267794, at *6 (S.D.N.Y. Mar. 29, 2016). Otherwise, the law "would require parents to send their child to a facially deficient placement school prior to challenging that school's capacity to implement their child's IEP, which is 'antithetical to the IDEA'[s] reimbursement process.'" *M.O.*, 793 F.3d at 244–45 (quoting *V.S. ex rel. D.S. v. N.Y.C. Dep't of Educ.*, 24 F. Supp. 3d 295, 300 (E.D.N.Y. 2014)). Thus, although Plaintiff is correct in stating that the SRO misapplied the law, Plaintiff's placement challenges are all speculative and thus impermissible.

Plaintiff asserts a number of arguments to support her claim that Hungerford could not implement the IEP. First, she claims that at Hungerford the building and lunchroom were too distracting and stimulating, the daily living skills she witnessed were too advanced for H.S., and the school did not have a sensory gym or adequate sensory equipment. Pl. Memo at 34. Second, Plaintiff argues that Hungerford's ban on touching students (as stated by Gullo) would significantly hinder H.S.'s ability to learn because of his dependency on physical contact. *Id.* at 35. Third, she claims that Pepe told her that it was likely that she would be receiving an RSA for the services that H.S. required and that there would be no guarantee that he would receive the services during the school day. *Id.* at 36. Defendants claim that these challenges are "impermissibly speculative, inaccurate, or not based on an actual requirement present in the IEP." Def. Memo at 44.

The Court agrees with Defendants. First, Plaintiff's claims that Hungerford could not implement the IEP because it was too noisy or stimulating, that the ADLs she witnessed were too

advanced, and that she H.S. would likely receive RSA's for the mandated services,[20] are too speculative, and thus not appropriate challenges.  *See generally*, *J.W. v. N.Y.C. Dep't of Educ.*, 95 F. Supp. 3d 592, 604 (S.D.N.Y. 2015) ("Speculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement.") (quoting *R.E.*, 694 F.3d at 195).  Plaintiff's claim that the alleged ban on touching would greatly hinder H.S.'s ability to learn is also similarly speculative.  Though Plaintiff characterizes H.S.'s needs as requiring "physical touch," the BIP does not actually include that mandate.  Instead, the BIP suggests that "deep pressure" be used to help H.S maintain a regulated state.  Both Pepe and Gullo testified about alternative sensory equipment that could be used to reach the same goals.[21]

Plaintiff's sole non-speculative claim is her challenge to Hungerford's ability to provide adequate sensory support for H.S.  Pl. Memo at 33.  She argues that Hungerford was inadequate because it did not have a sensory gym or the sensory equipment (*i.e.* swings, a trampoline, foof chair, and weighted vests), which Plaintiff claimed that H.S. required.  The IHO, however, found otherwise.  Though she noted that Hungerford did not have a sensory gym, the IHO credited Pepe's extensive testimony regarding the school's multipurpose room, its available sensory equipment, and its ability to obtain additional equipment depending on a student's needs. The Court thus defers to the IHO's particular finding.  "This challenge by [Plaintiff] requires the Court to draw a fact-based conclusion in a sensitive educational area—namely, whether a proposed placement has appropriate facilities and sensory equipment—which the Court is poorly positioned to do."  *GB v. N.Y. City Dep't of Educ.*, 145 F. Supp. 3d 230, 255 (S.D.N.Y. 2015).

---

[20] Moreover, at the hearing Pepe testified that related services could be provided in a number of different places, including in the classroom, and explained that an assessment of each student's needs would be conducted at the start of the school year.  Tr. 213-14.

[21] Gullo also testified that the occupational therapist was not included in this ban and that helping students put on particular equipment, including weighted vests, was allowed.  Tr. 438-39.

### E. Placement at the Rebecca School and Equitable Considerations

The Court finds that the SRO correctly determined that the District provided H.S a

FAPE.[22]  Accordingly, the Court need not decide whether the Rebecca School was appropriate,

or whether equitable considerations favor Plaintiff's request for tuition reimbursement.  *See M.C.*

*ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) ("If the challenged IEP

was adequate, the state has satisfied its obligations under the IDEA and the necessary inquiry is

at an end.").

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED and

Defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is

respectfully directed to terminate the motions (Docs. 21 & 27) and to close this case.

It is SO ORDERED.

Dated:      February 14, 2017
            New York, New York

_____
Edgardo Ramos, U.S.D.J.

---

[22] Defendants also argue that Plaintiff's Section 504 claims should be dismissed because she has failed to show either bad faith or gross misjudgment.  Defs. Memo at 45.  The Court agrees.  In fact, Plaintiff makes no mention of her Section 504 claim in her moving papers.  Moreover, since Plaintiff does not challenge Defendants' assertion, the Court finds that she has abandoned this claim.  *See Adams v. N.Y. State Educ. Dep't*, 752 F. Supp. 2d 420, 452 n.32 (S.D.N.Y. 2010) (collecting cases in which courts deemed plaintiff's claims abandoned for failure to address defendant's arguments)